IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ARIEL B., b/n/f DEBORAH B.,　　§
　　　　　　　　　　　　　　§
　　　　Plaintiffs,　　　　　§
　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　§　　Civil Action No. H-05-1474
　　　　　　　　　　　　　　§
FORT BEND INDEPENDENT SCHOOL　§
DISTRICT,　　　　　　　　　　§
　　　　　　　　　　　　　　§
　　　　Defendant.　　　　　§

## MEMORANDUM OPINION AND ORDER

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 24), Defendant's Motion to Strike Plaintiffs' Response (Docket Entry No. 42), and Plaintiffs' Motion for Leave to File Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment (Docket Entry No. 43). The court has considered the motions, all relevant filings, and the applicable law. The court **GRANTS** Plaintiffs' motion to file an amended response. Because Plaintiffs' amendment fully supplants her original response, the court **DENIES** Defendant's Motion to Strike[2] as **MOOT**. For the reasons set forth below, the court **GRANTS** Defendant's Motion for Summary Judgment.

## I.  Case Background

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry No. 17.

[2]    Defendant also filed a motion to strike Plaintiffs' amended response. Docket Entry No. 46. The court ruled on that motion in an order dated January 17, 2006. Docket Entry No. 51.

This is an appeal of the decision of a special education hearing officer in a Texas Education Agency proceeding filed under the Individuals with Disabilities Education Act ("IDEA").[3]   In their complaint before this court, Plaintiffs Ariel B. ("Ariel") and her mother Deborah B. ("Deborah") also alleged that Defendant discriminated and retaliated against Plaintiff Ariel based on her disability in violation of the Americans with Disabilities Act ("ADA")[4] and the Rehabilitation Act ("RA"),[5] allowed Ariel to be sexually harassed in violation of Title IX of the Education Amendments of 1972 ("Title IX"),[6] and retaliated against Plaintiff Deborah for her speech in violation of the First Amendment of the United States Constitution ("First Amendment").

The history of this case predates the filing of this suit by many years.  Ariel first qualified for special education services in 1999 under the categories of "emotional disturbance" and "other health impaired" due to attention deficit, hyperactivity disorder, and depression.[7]  Three years later, she also qualified for "other health impaired" due to a sleep disorder.[8]   Her sleep disorder

---

[3]     20 U.S.C. §§ 1400-1482.

[4]     42 U.S.C. §§ 12101-12213.

[5]     29 U.S.C. §§ 701-7961.

[6]     20 U.S.C. § 1681.

[7]     Administrative Record, Docket Entry No. 6, Vol. III, p. 955.

[8]     Id.

caused her to sleep late in the day and to stay awake late at night.[9]

In January 2003, Ariel was in the second semester of her second year of seventh grade.[10]  She was thirteen years old.[11]  At that time, Deborah re-enrolled Ariel in Defendant's First Colony Middle School, following a failed attempt at private school.[12] Deborah requested an intra-district transfer to Dulles Middle School, but the request was denied.[13]

An annual Admission, Review, and Dismissal ("ARD") Committee meeting convened on January 9, 2003, to review Ariel's educational performance and to prepare for her reentry into public school.[14] In Texas, the ARD Committee is charged with preparing a student's individualized education program ("IEP"), which is a written statement of the disabled child's present level of academic achievement, measurable annual educational goals, and special education, related services, and other accommodations to be

---

[9]      See id. at Vol. IV, p. 1028.

[10]     See id. at Vol. III, pp. 902 (providing Ariel's age and grade level in January 2005), 903 (indicating that she failed seventh grade); Vol. IV, pp. 1002 (noting that the spring semester had begun), 1005 (noting that Ariel was in seventh grade), 1025 (indicating that she failed seventh grade), 1028 (stating Ariel's birth date).

[11]     See id. at Vol. IV, p. 1028.

[12]     See id. at Vol. IV, p. 1002.

[13]     See id.

[14]     Id. at p. 1005.

provided to the child.[15]   The ARD Committee is composed of the
disabled child's parent(s), at least one special education teacher
and/or one regular education teacher, a representative of the
school district, someone who can provide insight into the
instructional implications of the child's clinical evaluation, and,
when appropriate, other individuals with special knowledge or
expertise related to the child and the child herself.[16]

In January 2003, Deborah, a school administrator, a clinical
diagnostician, a special education teacher, a regular education
teacher, a department head, and the special education coordinator
attended the meeting.[17]   The minutes identify the first five of
these attendees as the "consensus members," apparently a reference
to the official committee members whose votes determined the course
of Ariel's educational program.[18]   As noted in the minutes, "Ariel
is bright and above average in her writing.  She is quick to learn
new concepts.  She has strength in written language, good verbal
skills[, and] high average IQ [intelligent quotient] level."[19]
Participant reports indicated that Ariel was "very successful" when

---

[15]     See 20 U.S.C. § 1414(d)(1)(A)(i); Adam J. ex rel. Robert J. v.
Keller Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003).

[16]     See 20 U.S.C. § 1414 (d)(1)(B); Adam J. ex rel. Robert J., 328 F.3d
at 808.

[17]     Administrative Record, Docket Entry No. 6, Vol. IV, pp. 1015, 1020.

[18]     Id.

[19]     Id. at p. 1006.

4

she attended school, but she did not attend regularly.[20]

The resultant IEP for Ariel included goals of eighty-percent completion of assignments and seventy-five-percent attendance.[21] The IEP also allowed resource assistance as needed, behavior rewards and consequences, unlimited time to complete tests and assignments, a home set of books, and visits to the clinic as desired.[22] The committee placed Ariel in a full schedule of classes including office work, math, English, history, and science.[23] The official members of the committee mutually agreed to the plan.[24]

On January 30, 2003, Deborah requested homebound services.[25] David Ansell, D.O., ("Dr. Ansell"), who began treating Ariel on January 15, 2003, completed a medical form in support of homebound services.[26] Dr. Ansell, who is board certified in child and adolescent psychiatry, based his recommendation on Ariel's inability to awaken prior to 3:00 p.m.[27] He recommended that the homebound instruction be provided at a local library from 3:00 p.m.

---

[20]   Id.

[21]   Id. at pp. 1007-08.

[22]   Id. at pp. 1007-08, 1010-11, 1015-19.

[23]   Id. at p. 1009.

[24]   Id. at p. 1018.

[25]   Id. at p. 1026.

[26]   Id. at pp. 1027-28.

[27]   Id.

5

to 5:00 p.m., Monday through Thursday.[28]

The ARD Committee reconvened on February 20, 2003, to consider Deborah's request and Dr. Ansell's recommendation.[29] Not all of the consensus members were the same people who attended the January meeting, but they included Deborah, two teachers, a diagnostician, and a school administrator.[30] Also in attendance were a department head, the special education coordinator, a homebound teacher, Dr. Ansell, and Defendant's attorney. A majority of the members decided against homebound services, but recommended Ariel attend school from 3:00 p.m. to 5:00 p.m. for math class and after-school tutorials.[31] Deborah disagreed with the suggested placement.[32]

The committee met again on February 26, 2003, to continue the discussion from February 20, 2003.[33] All of the attendees from the previous February meeting returned, except Dr. Ansell.[34] Deborah stated that Ariel was experiencing a lot of anxiety about attending school because she had not bonded with anyone at school and because other children said things about her.[35] Deborah mentioned that

---

[28]   Id. at p. 1028.

[29]   Id. at pp. 1030, 1033.

[30]   Id. at pp. 1033, 1037.

[31]   Id. at pp. 1032-36.

[32]   Id. at p. 1037.

[33]   See id. at pp. 1044-47.

[34]   See id. at p. 1047.

[35]   Id. at p. 1045.

6

Ariel needed inpatient care because she was not getting better.[36]
The committee members could not reach consensus because Deborah was
the only one who supported homebound services.[37]

In March 2003, Plaintiffs filed a lawsuit against Defendant
and others for violations of the IDEA, the ADA, the RA, and the
First Amendment stemming from issues raised in a May 2002 request
for a due process hearing.[38]  The time period covered by that
lawsuit spanned the 2000-2001 and 2001-2002 school years and the
first two months of the 2002-2003 school year.[39]

One day during final exams in the spring of 2003, a male
student pulled down Ariel's top and touched her breast while
another male student took a photograph.[40]  Ariel kicked and slapped
the male student who pulled down her shirt.[41]   Witnessing only
Ariel's reaction, a teacher confronted Ariel, who responded that
the boy had pulled down her "F---ing" shirt.[42]  The teacher led the
students to see the associate principal and recounted the incident

---

[36]    Id. at p. 1046.

[37]    Id. at p. 1047.

[38]    See Defendant's Motion for Summary Judgment, Docket Entry No. 24, Ex.
A, Memorandum and Order in Civil Action No. H-03-1001, pp. 2, 10.

[39]    Id. at 10.

[40]    Administrative Record, Docket Entry No. 6, Vol. IV, p. 1081.

[41]    Id.

[42]    Id.

to him.[43]  The associate principal reprimanded both students, but, according to Deborah, blamed Ariel because she wore Mardi Gras beads that distracted the male student.[44]

Disappointed with the school administration's response, Deborah complained and insisted on an investigation.[45]  Deborah believed that the incident was one of several in which the school ignored the complaints of harassment lodged by female students.[46] The principal of First Colony Middle School, Lee Crews ("Crews"), conducted an administrative investigation, but was unable to determine whether the boy accused by Ariel had pulled down her top.[47]  The principal notified the boy's parents of the allegations and gave the boy a "strong warning . . . that such conduct would not be tolerated."[48]

On June 4, 2003, the ARD Committee convened to plan for Ariel's summer educational services.[49]  The identified consensus members were Deborah, a special education teacher, a regular

---

[43]   Id.

[44]   Id.

[45]   Id. at pp. 1082, 1085-86.

[46]   Id. at pp. 1083, 1090.

[47]   Id. at Vol. VI, p. 1721.

[48]   Id.

[49]   Id. at Vol. IV, p. 1069.

8

education teacher, and a school administrator.[50]  Many other persons
attended, including Deborah's advocate, Dr. Ansell, and Defendant's
attorney.[51]  Ariel's attendance report for the 2002-2003 school year
reflected 126 all-day absences over the course of approximately 180
school days.[52]  Despite her excessive absenteeism, Ariel passed her
final exams, and the ARD Committee advanced her to eighth grade.[53]
Defendant agreed to pay for summer services to include tutoring
sessions from noon until 4:00 p.m., Monday through Thursday, and
eight counseling sessions with Dr. Ansell.[54]  Ariel's IEP included
attendance and educational goals.[55]  The ARD Committee planned to
meet again before the fall semester began.[56]  Deborah withheld her
consent as to some aspects of the placement, but, nevertheless,
requested that Defendant proceed with the summer programs.[57]

     At the end of the summer, in late July, the ARD Committee met
to review Ariel's summer progress and to discuss her eighth-grade

---

[50]     Id. at p. 1075.  The clinical diagnostician, who was listed in
previous ARD Committee notes as a consensus member, was named with the other
participants in the notes of the June meeting.  See id.

[51]     See id. at pp. 1069, 1075.

[52]     Id. at p. 1079.  In Texas, every school district must provide a
minimum of 180 days of classroom instruction.  Tex. Educ. Code § 25.081.

[53]     Administrative Record, Docket Entry No. 6, Vol. IV, pp. 1063, 1072.

[54]     Id. at pp. 1069-71.

[55]     Id. at pp. 1066-67.

[56]     Id. at p. 1071.

[57]     Id. at pp. 1074-75.

9

placement.[58]   As with the June meeting, the consensus members
included Deborah, a special education teacher, a regular education
teacher, and a school administrator.[59]   Dr. Ansell also attended,
as did Deborah's advocate and Ariel's summer tutor, among others.[60]
According to the ARD Committee report, Ariel performed well in her
summer studies, but continued to have attendance problems.[61]   Dr.
Ansell also reported that Ariel failed to make all of her scheduled
appointments with him.[62]   Deborah requested residential placement.[63]
The request was supported by Dr. Ansell, who was disappointed by
Ariel's summer attendance, opining that she was "far below where
she need[ed] to be."[64]   He recommended an inpatient treatment
program that could address Ariel's sleep disorder and self-esteem
problems.[65]

       The ARD Committee agreed that a psychological evaluation
should be completed within forty-five days, and a majority of
members opted to postpone a decision on inpatient treatment until

------

[58]      Id. at p. 1104.

[59]      Id. at p. 1111.

[60]      Id. at pp. 1104, 1111.

[61]      Id. at pp. 1097, 1104-05.

[62]      Id. at p. 1105.

[63]      Id. at p. 1107.

[64]      Id. at p. 1105.

[65]      Id.

10

after the completion of the psychological evaluation.[66]   In the
meantime, the committee decided to place Ariel in eighth grade with
a full-day schedule in regular education with one additional hour
of tutoring.[67]   Ariel's proposed schedule included English, math,
science, and social studies.[68]   Although Deborah agreed with the
other members on most issues, she lodged her disagreement with the
recommendation to postpone consideration of residential treatment
until a psychological evaluation could be completed.[69]

     The committee met again on August 13, 2003, to attempt
agreement on the plan for eighth grade.[70]   Although the consensus
members remained the same, new participants included a guardian ad
litem for Ariel and the school principal.[71]   In addition to the
previous recommendation of regular classes, one hour of after-
school tutoring, and a psychological evaluation, committee members
proposed one-on-one tutoring for Ariel and enrollment in a high
school with evening classes.[72]   Deborah agreed with one-on-one

---

[66]     Id. at pp. 1096, 1107.

[67]     Id. at p. 1106.

[68]     Id. at p. 1098.

[69]     See id. at p. 1111.

[70]     Id. at p. 1117.

[71]     Id. at pp. 1116, 1117.  Again, a diagnostician attended, but was not
considered a consensus member.  See id.

[72]     Id. at pp. 1118-19.

11

tutoring, but not with the evening classes.[73]  She also disagreed with the suggested provider and date for the psychological evaluation.[74]  Otherwise, Deborah agreed to the proposed placement.[75]

At Deborah's request, the ARD Committee met again four months later.[76]  Many of the same members and participants attended.[77]  By the date of this ARD Committee meeting, which occurred approximately seventy-nine school days into the semester, Ariel had accumulated sixty-two all-day unexcused absences.[78]  Deborah sought additional tutoring for Ariel, but a majority of the committee decided against it.[79]  The committee also discussed Deborah's requests for residential placement or transfer to another school, but made no decision.[80]  Deborah had not completed the questionnaire for Ariel's psychological evaluation that had been requested by Karen Gollaher, Psy.D., ("Dr. Gollaher"), an outside psychologist hired by Defendant.[81]  According to Dr. Gollaher, Deborah had

---

[73]    Id. at p. 1122.

[74]    Id. at p. 1121.

[75]    Id. at p. 1116.

[76]    Id. at p. 1156.

[77]    See id. at p. 1153.

[78]    Id. at p. 1183.

[79]    Id. at pp. 1156-57.

[80]    Id. at pp. 1157, 1158.

[81]    Id. at p. 1158; Vol. V, p. 1534.

impeded the process in general.[82]   The committee postponed the meeting until January 2004.[83]

On January 2, 2004, while Plaintiffs' first federal case still was pending, Deborah filed a request for a second due process hearing contending that Defendant failed to identify Ariel as a student with a disability, failed to evaluate whether she had a disability under the IDEA, failed to place her in proper educational services, and failed to provide her with a free appropriate public education.[84]  Deborah sought an order directing Defendant to follow the IDEA, to reimburse her for the cost of private educational services, to provide compensatory special education services, to grant an intra-district transfer, and to prohibit Defendant's counsel from directing ARD Committee meetings.[85]

When the ARD Committee reconvened on January 20, 2004, the committee considered Dr. Gollaher's evaluation and recommendation, which she completed just two days before the meeting.[86]  With regard to residential placement, Dr. Gollaher stated:

1.  Given this intertwining of issues and the failure of the multiple methods that have been implemented in the

---

[82]    Id. at Vol. V, p. 1534.

[83]    Id. at Vol. IV, p. 1158.

[84]    Id. at Vol. I, p. 194.

[85]    Id. at p. 195.

[86]    Id. at Vol. IV, pp. 1205-07; see also pp. 1236-42.

least restrictive environment, I believe the only
remaining option is to implement a more intensive level
of environment.  Anything else will be a "band aid"
approach and it is likely that Ariel will continue to
miss school and fall further behind academically.

2.  With regards to this environment, it is recommended
that Ariel be placed into a structured setting where the
staff is knowledgeable about psychiatric issues and/or
willing to take them into account.  Examples include a
hospital inpatient unit for sleep disorders . . ., a day
program or a residential facility.  It would be optimal
if she were placed into a facility for at least one
semester to address her multiple issues in a structured
manner and provided intensive intervention for her sleep
disorder and psychiatric issues while still focusing on
her academics.  If initially placed into a residential
facility, it is recommended that she be transferred at
some point to a lesser restrictive environment(such as
residing in another residence relatively close to her
mother) and . . . return to the regular school
district.[87]

Based in part on this report and Dr. Ansell's recommendation,

the committee agreed that residential placement was appropriate for

Ariel.[88]  However, not all in attendance agreed with Dr. Gollaher's

recommendation that Ariel be transferred to a less restrictive

environment before returning home.[89]  Against Deborah's wishes, the

remaining committee members decided to contact Dr. Gollaher for

help in selecting an appropriate facility and in developing IEP

goals for Ariel.[90]  The meeting ended in a recess to allow time for

---

[87]    Id. at Vol. I, pp. 175-76.

[88]    Id. at Vol IV, pp. 1205-06.

[89]    Id. at pp. 1206, 1209.

[90]    Id. at p. 1206.

14

this to occur.[91]  Although Deborah agreed with the recommendation
of residential placement at that time, she disagreed with several
other aspects of the majority's proposal, including the
solicitation of Dr. Gollaher's opinion (over that of Dr. Ansell) on
the appropriate facility and the IEP goals.[92]

On January 26, 2004, at a prehearing conference for the second
due process hearing, Deborah contended that:  1) the appropriate
educational placement for Ariel was residential; 2) Defendant
delayed providing Ariel with appropriate services; 3) Deborah was
entitled to reimbursement for expenses related to private
psychiatric services; 4) Ariel was entitled to an intra-district
transfer; 5) Defendant improperly denied homebound service to
Ariel; 6) Defendant failed to formulate an appropriate IEP for
Ariel; and 7) Defendant's counsel improperly directed the ARD
Committee meetings.[93]

Also sometime in January 2004, the school administered a
mathematics assessment to Ariel, who scored above average.[94]  The
ARD Committee reconvened on January 27, 2004.[95]  In addition to the
individuals who participated in the meeting on January 20, 2004, a

---

[91]   Id. at p. 1207.

[92]   See id. at pp. 1210-11, 1226-28.

[93]   Id. at Vol. 1, p. 154.

[94]   Id. at Vol. IV, p. 1267; Vol. IX, hearing transcript, p. 428.

[95]   Id. at Vol. IV, pp. 1207, 1214.

15

representative from Bayes Achievement Center ("Bayes"), one of the residential facilities recommended by Deborah, appeared by phone.[96] The representative and attendees discussed IEP goals in the areas of scheduling, education, behavior, and transition.[97] The committee approved the placement, and the representative estimated that the admission process could be accomplished in a matter of four days by mail.[98] A majority of the members voted against Deborah's requests for an additional session with Dr. Ansell and for transportation to the residential facility.[99]

Deborah refused to agree entirely with the plan (although she agreed with residential placement) based on several alleged violations of procedure, the denial of a preparatory therapy session with Dr. Ansell, the denial of transportation, and the denial of reimbursement for other related expenses.[100] Deborah also disagreed in advance to what she believed to be Defendant's intention "to reduce Ariel's placement in residential based on cost instead of leaving residential based upon Ariel's recovery and progress."[101]

---

[96]   Id. at p. 1214.

[97]   See id.

[98]   Id. at p. 1215.

[99]   Id.

[100]   See id. at pp. 1216, 1230-33.

[101]   Id. at p. 1233.

After the January meetings, Deborah toured the Bayes facility
and decided that it was not appropriate for Ariel.[102]  The committee
held its third session of the semester on February 25, 2004, to
discuss Deborah's visits to Bayes and other residential facilities
and her opinions about the different programs.[103]  Crews suggested
that Deborah select a residential facility for the committee to
consider.[104]  The meeting ended without the suggestion of an
appropriate facility and with no accepted changes in the plan.[105]
Deborah submitted an addendum, in which she disagreed with the
other consensus members on numerous issues, including the denial of
reimbursement for certain services and the failure to address her
perceived lack of contact with Ariel's teachers.[106]

According to her attendance record for the 2003-2004 school
year, Ariel was present only thirteen days.[107]  In May 2004,
Defendant's Board of Trustees voted to allow Ariel to transfer from
First Colony Middle School to Dulles Middle School should the ARD
Committee decide not to promote her to high school.[108]  Testing of
Ariel in that same month at Huntington Learning Center ("HLC")

---

[102]   Id. at p. 1266.

[103]   Id. at pp. 1266-67.

[104]   Id. at p. 1267.

[105]   See id.

[106]   Id. at pp. 1270-73.

[107]   Id. at Vol IX, hearing transcript, pp. 425-26.

[108]   Id. at Vol. VI, p. 1719.

revealed very good reading comprehension skills; good vocabulary, mathematics, and oral reading skills; and poor oral/listening and silent passage reading skills.[109]

In June 2004, Plaintiffs amended their request for a due process hearing.[110]  The new request greatly expanded the scope of the hearing by adding numerous allegations regarding the denial of a free appropriate public education for Ariel and by requesting many additional resolutions and reimbursements.[111]  At that time, Plaintiffs continued to seek residential placement for Ariel, but no longer sought an intra-district transfer, which had been conditionally granted by Defendant's Board of Trustees prior to Plaintiffs' amendment.[112]

Later in the summer of 2004, the district judge presiding over the prior lawsuit devoted tremendous amounts of time and attention to these parties to encourage consensus.[113]  According to Deborah, the judge recommended that the parties settle their dispute and place Ariel at the Texas Hill Country School ("THCS").[114]  Deborah refused the placement because Defendant was "using the placement as

---

[109]    Id. at Vol. II, pp. 200-01.

[110]    Id. at pp. 351-82.

[111]    Id. at pp. 374-81.

[112]    See id. at p. 378; Vol. VI, p. 1719.

[113]    See, e.g., id. at Vol. III, p. 812.

[114]    Id. at p. 990.

18

a pretext to remove the Petitioners from Fort Bend I[ndependent] S[chool] D[istrict]" ("Fort Bend ISD") and because the plan for Ariel's return from THCS was not satisfactory.[115]   In a letter to the judge concerning this issue, Deborah explained that she no longer agreed to residential placement, despite Defendant's acquiescence to placing Ariel at THCS.[116]   Therein, Deborah explained that she withheld her consent largely because the length of the admission was uncertain.[117]

From June 1 to August 4, 2004, Ariel attended HLC for forty-six of the 254 hours of instruction recommended by HLC.[118]   In spite of her low attendance rate, Ariel made some scholastic progress.[119] On August 18, 2004, the committee met again.[120]   According to a letter from the special education coordinator to Deborah, the committee encountered significant difficulty in reaching an agreement with Deborah as to the date for this meeting, resulting in at least a month's delay.[121]   The consensus members were Deborah, a school administrator, a special education teacher, and a regular

---

[115]   Id.

[116]   Id. at pp. 801-04.

[117]   Id. at p. 802.

[118]   Id. at Vol. V, pp. 1623-25, 1627-28.

[119]   Id. at p. 1623.

[120]   Id. at Vol. IV, p. 1294.

[121]   See id. at Vol. III, p. 862.

education teacher.[122]   Among the many other participants were Deborah's advocate, Defendant's attorney, and HLC's representative.[123]

At the time of the meeting, Ariel was attending ninth grade at Dulles High School ("DHS") even though she had not completed the requirements of eighth grade.[124]   Permanent placement in the ninth grade was an issue of consideration for the committee, along with residential placement.[125]   Deborah no longer supported residential placement.[126]   Dr. Ansell, on the other hand, continued to favor placement at a residential treatment center.[127]   A representative from THCS explained the THCS residential program by phone.[128] Deborah expressed concern that Ariel's length of stay at THCS was undetermined.[129]   The representative reassured her that the length of stay would be determined by Ariel's progress and the school's ability to meet her needs.[130]

---

[122]   Id. at Vol. IV, p. 1302.

[123]   Id.

[124]   Id.

[125]   Id.

[126]   Id.

[127]   Id.

[128]   Id.  TCHS assessed Ariel in April 2004 for possible placement.  Id. at Vol. II, pp. 222-27.

[129]   Id. at Vol. IV, p. 1302.

[130]   Id.

Although the majority of the ARD Committee recommended placement at THCS, consensus could not be reached because Deborah disagreed.[131] The committee, therefore, placed Ariel in ninth grade at DHS with a regular schedule that included English, algebra, Spanish, and geography, among other classes.[132] The plan included various modifications and allowances such as extended time for assignments and tutoring sessions.[133] Deborah objected to the IEP goals because they were drafted at the prior ARD Committee meeting.[134] She also withheld her agreement to the other members' proposals with regard to placement at DHS.[135]

After the meeting, two members of the ARD Committee overheard Deborah remark that she should "bring a bomb up here and blow this place up with those people in it."[136] Crews reported the incident as a bomb threat to Defendant's police department.[137] In response to Deborah's remark, Defendant's legal counsel banned Deborah from Defendant's property without express prior permission from the

---

[131]   Id. at p. 1303.

[132]   Id. at p. 1302; see also Vol. III, p. 866.

[133]   Id. at Vol. IV, p. 1303.

[134]   Id. at p. 1302.

[135]   Id. at p. 1304.

[136]   Id. at Vol. III, p. 653; see also Vol. IX, hearing transcript, pp. 434-35.

[137]   Id. at Vol. III, p. 653; Vol. IX, hearing transcript, pp. 434-35.

school principal or Defendant's staff attorney.[138]   The police
investigated and reported the threat to the Fort Bend County
district attorney, who rejected the case at the intake stage.[139]
Deborah was never arrested or formally charged with this
allegation.  She filed a grievance concerning the property access
restriction that progressed through several layers of appeal before
Defendant lifted the ban sometime around January 2005.[140]

On August 25, 2004, the ARD Committee met again.[141]  Despite
having been given permission to attend the meeting, Deborah refused
to attend.[142]  By letter dated August 25, 2004, Deborah expressed
her concern that Defendant's counsel would have her arrested
regardless of her conduct:

> Given the two years of contentious litigation with Mr.
> Jeffery Rogers, it is obvious that he will arrange in
> advance to have the police waiting to arrest me, even
> prior to an alleged violation.  I refuse to be willingly
> set up by Mr. Rogers and Fort Bend ISD.  As a result[] of
> these threats of arrest, intimidation, harassment and
> retaliation, I will not appear for an ARD meeting on Fort
> Bend ISD school property.[143]

In Deborah's absence, the committee spoke by phone with Ariel's

---

[138]   Id. at Vol. III, p. 671.

[139]   See id. at pp. 551-52, 669.

[140]   Id. at Vol. VI, pp. 1808-09, 1839-40; Plaintiffs' First Amended
Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, Ex. A,
Deborah's Affidavit, ¶ 82.

[141]   Administrative Record, Docket Entry No. 6, Vol. IV, p. 1316.

[142]   Id. at Vol. III, pp. 672, 693.

[143]   Id. at p. 693.

court-appointed guardian ad litem and a representative of THCS.[144]
The members present all agreed that the best placement for Ariel
was at THCS.[145]

Ariel continued to have problems in school during September
2004, despite somewhat improved attendance.[146]  Deborah wrote a
lengthy letter to the DHS principal, Defendant's director of
instructional support services, and Defendant's superintendent
detailing numerous complaints about the implementation of Ariel's
IEP and recounting Deborah's continuing battles with Defendant.[147]

At an evening football game in early October, a female student
from another high school assaulted Ariel.[148]  The other student ran
off when a DHS associate principal identified herself and attempted
to stop the fight.[149]  Although police officers did not stop and
detain the girl Ariel accused of attacking her, they did interview
Ariel and took photographs her injuries.[150]  Defendant assessed a
three-day suspension as punishment for the girl who initiated the
fight.[151]  Additionally, the district attorney pressed charges

---

[144]    Id. at Vol. IV, p. 1326.

[145]    Id.

[146]    See id. at Vol. VI, pp. 1784-1800.

[147]    Id.

[148]    See id. at Vol. III, p. 544.

[149]    Id.

[150]    Id. at p. 544-45.

[151]    Id. at Vol. VI, p. 1839.

against her, and she received a sentence of community service pursuant to a plea agreement.[152]

On the issue of Ariel's performance during the fall semester of 2004, her teachers and tutors consistently stated that Ariel was a well-behaved, hard-working, successful student when she was in attendance.[153]  Several teachers noted that she did not consistently complete her makeup assignments.[154]  On November 18, 2004, Deborah filed a code of ethics complaint against several special education teachers and administrators from Ariel's middle and high schools based on a litany of grievances including allegations of falsifying information about Ariel and failing to give input at ARD Committee meetings.[155]

At the end of the fall semester, Ariel had several "incompletes" on her report card.[156]  Deandria Mayo ("Mayo"), special education department chair, took a packet of schoolwork to HLC for Ariel to complete over the break along with an extra set of text books.[157]  In January, Mayo went back to HLC and picked up

---

[152]   See Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, Ex. A, Deborah's Affidavit, ¶ 93.

[153]   See Administrative Record, Docket Entry No. 6, Vol. VI, pp. 1848-54; Vol. IX, hearing transcript, pp. 329, 476.

[154]   See id. at Vol. VI, pp. 1848, 1851, 1853, 1854.

[155]   Id. at pp. 1829-43.

[156]   See id. at Vol. IX, hearing transcript, p. 477.

[157]   Id. at pp. 479-80.

everything.[158]    Ariel  had  not  attended  HLC  at  all  during  the
break.[159]

Plaintiffs  amended  their  request  for  a  second  due  process
hearing again in January 2005.[160]  By that time, Plaintiffs opposed
residential  placement.[161]    Other  than  this  change  of  heart,
Plaintiffs' amended request was little more than an updated version
of their first amendment.[162]  After many continuances, the hearing
finally convened on January 18 and 19, 2005.[163]  Ariel's attendance
problems  were  ongoing  as  of  the  date  of  the  second  due  process
hearing.[164]  Nine witnesses testified at the hearing, including Dr.
Ansell, Deborah, Crews, and Mayo.[165]  Dr. Ansell testified that he
continued to believe residential treatment was the best option for
Ariel.[166]  As a second choice, he suggested "a model very similar to
residential  treatment,  which  would  include  all  sorts  of  things  .  .
.  rewards,  incentives  for  her  getting  up  at  an  earlier  hour,  for
her making efforts when she makes it to tutoring or class  .  .  .

---

[158]    _Id._ at p. 480.

[159]    _Id._

[160]    _Id._ at Vol. III, pp. 952-98.

[161]    _Id._ at p. 958.

[162]    See _id._ at pp. 952-98.

[163]    See _id._ at Vols. VIII and IX.

[164]    See _id._ at Vol. IX at p. 481.

[165]    See _id._ at Vols. VIII and IX.

[166]    _Id._ at Vol. VIII, p. 143.

[and] removal of privileges when she doesn't."[167]

The hearing officer issued an opinion on February 10, 2005.[168] He determined that Defendant properly developed an IEP for Ariel that was "reasonably calculated to enable her to receive educational benefit" and that Plaintiffs failed to demonstrate that the IEP was not appropriate.[169]   Although ruling in favor of Defendant on the proposed educational placements for Ariel, the hearing officer ordered Defendant to reimburse Deborah for Ariel's transportation to and from tutoring sessions.[170]

About six weeks after the decision, the district court judge presiding over Plaintiffs' first lawsuit issued a Memorandum and Order resolving the case in favor of Defendant.[171]   The court's ruling affirmed the decision of the hearing officer in the first due process hearing and dismissed Plaintiffs' other causes of action for lack of merit.[172]

After the issuance of the hearing officer's decision and the district court's final judgment, Defendant notified Plaintiffs that the ARD Committee's decision to place Ariel at THCS would be

---

[167]   Id. at p. 135.

[168]   Plaintiff's Original Complaint, Docket Entry No. 1, attach. 1, Decision of the Hearing Officer.

[169]   Id. at pp. 4-5.

[170]   Id. at p. 5.

[171]   Defendant's Motion for Summary Judgment, Docket Entry No. 24, Ex. A, Memorandum and Order in Civil Action No. H-03-1001, p. 24.

[172]   Id.

implemented despite Deborah's objections.[173]  Defendant indicated that it would withdraw Ariel from DHS on April 22, 2005.[174] Apparently, when Deborah refused to enroll Ariel at THCS, Defendant allowed Ariel to continue to attend classes at DHS.[175]

Plaintiffs disagreed with the second hearing officer on all issues, including the amount of reimbursement, and filed a complaint in this court on April 22, 2005.[176]  In addition to challenging the hearing officer's findings on the appropriateness of Ariel's educational placement and the amount of reimbursement, Plaintiffs alleged that the hearing officer erred when he failed to find that Defendant's harassing and retaliatory conduct prevented the provision of special education and related services in a coordinated and collaborative manner.[177]  Plaintiffs also raised the non-IDEA causes of action mentioned above.[178]

In the meantime, Ariel participated on the high school softball team and developed friendships with her teammates.[179] During the summer of 2005, Ariel attended HLC from 2:20 p.m. to

---

[173]    Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, Ex. A, Deborah's Affidavit, ¶ 100.

[174]    Id.

[175]    See id. at ¶ 102.

[176]    See Plaintiffs' Original Complaint, Docket Entry No.1.

[177]    Plaintiffs' Original Complaint, Docket Entry No. 1, pp. 13-14.

[178]    Id. at pp. 14-18.

[179]    Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, Ex. A, Deborah's Affidavit, ¶ 102.

7:30 p.m. to make up her credits from the 2004-2005 school year.[180]
Ariel received good grades.[181]  In August 2005, Ariel returned to
the ninth grade at DHS.[182]  Ariel was successful with her grades and
attendance during the fall semester.[183]

On September 6, 2005, Defendant filed the instant motion for
summary judgment in this case.  Plaintiffs requested that the court
hold Defendant's motion in abeyance until the court ruled on other
nondispositive pending motions.[184]  The court ordered Plaintiffs and
Defendant to attempt once more to agree to an IEP for Ariel's
education and extended the due date for Plaintiffs' response to
November 18, 2005.[185]  Plaintiffs sought, and the court granted, an
additional extension for their response until December 12, 2005.[186]

Unfortunately, Ariel was involved in another physical
altercation in November 2005.[187]  According to Ariel, another female

---

[180]   See id. at ¶ 106.

[181]   See id.

[182]   Id. at ¶ 108.

[183]   Id.; see also Ex. A-6, fall attendance report; Ex. A-7, fall semester
grade report.

[184]   Plaintiffs' Motion for Continuance to File Plaintiffs' Response to
the Defendant's Motion for Summary Judgment and to Hold the Defendant's Motion
for Summary Judgment in Abeyance, Docket Entry No. 29.

[185]   Order, Docket Entry No. 33, p. 4.

[186]   Plaintiffs' Opposed Motion for Continuance to File Plaintiffs'
Response to the Defendant's Motion for Summary Judgment and to Hold the
Defendant's Motion for Summary Judgment in Abeyance, Docket Entry No. 36; Order,
Docket Entry No. 38.

[187]   Plaintiffs' First Amended Response to Defendant's Motion for Summary
Judgment, Docket Entry No. 45, Ex. A, Deborah's Affidavit, ¶ 110.

student threw something at Ariel.[188]   When Ariel responded verbally,

the other student began to hit and kick Ariel.[189]   After the

incident, Deborah wrote a letter to Deborah Nordt ("Nordt"),

associate principal at DHS, questioning whether the school "had a

hand in this altercation."[190]   In her response, Nordt denied the

accusation and assured Deborah that the school was taking

appropriate measures to respond to the incident.[191]   Immediately

following the physical altercation, Ariel's attendance dropped off

significantly.[192]   She was absent part or all of thirteen of the

next fifteen school days, more than doubling her absences for the

semester.[193]

The court proceedings continued.   Plaintiffs' response to

Defendant's summary judgment motion, which Plaintiffs filed on the

deadline, exceeded the number of pages allowed by the court.[194]

Upon Defendant's objection to the length of Plaintiffs' response,

---

[188]   Plaintiffs' First Amended Response to Defendant's Motion for Summary
Judgment, Docket Entry No. 45, Ex. A-3, Ariel's Affidavit, ¶ 2.

[189]   Id.

[190]   Id. at Ex. A-4, letter from Deborah to Nordt dated Nov. 14, 2005, p.
2.

[191]   Id. at Ex. A-5, letter from Nordt to Deborah dated Nov. 15, 2005.

[192]   See id. at Ex. A-6, fall attendance report; Ex. A-8, letter from
Nordt to Deborah dated Dec. 12, 2005.

[193]   See id. at Ex. A-6, fall attendance report; Ex. A-8, letter from
Nordt to Deborah dated Dec. 12, 2005.

[194]   See Response to Defendant's Motion for Summary Judgment, Docket Entry
No. 40; Order dated Dec. 15, 2005, Docket Entry No. 41.

Plaintiffs filed an amended response that technically met with the court's page limit.[195]   Despite Defendant's motion to strike the amended response, the court allowed Plaintiffs' response.[196]   The court now addresses the pending summary judgment motion and amended response.

## II.   Standards of Review

A.   IDEA Claim

The IDEA directs courts, when reviewing a state hearing officer's decision, to receive the records of the administrative proceedings, to hear additional evidence at the request of a party, and to grant appropriate relief based on a preponderance of the evidence.   20 U.S.C. § 1415(i)(2)(C).   The court must accord due weight to the hearing officer's findings, but also must review the evidence and must "reach an independent decision based on a preponderance of the evidence." Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000)(quoting Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 252 (5th Cir. 1997)); see also Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003).   The Fifth Circuit refers to the district court's standard of review as "virtually de novo." Adam J. ex rel. Robert J., 328 F.3d at 808; Bobby R., 200 F.3d at 347.

---

[195]   See Motion to Strike Response to Motion, Docket Entry No. 42; Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45.

[196]   Order, Docket Entry No. 51.

Although the history between the parties is long and rocky, the only time period covered by the present IDEA claim is January 2, 2003, through February 10, 2005. The period begins one year prior to the date that Plaintiffs filed the instant request for a due process hearing and ends on the date that the hearing officer issued his decision. Any complaint based on Defendant's actions before this time period is barred by limitations. See 19 Tex. Admin. Code § 89.1151(c). As for complaints based on occurrences after the due process hearing, the court cannot exercise subject matter jurisdiction because Plaintiffs have not exhausted administrative remedies under the IDEA. See 20 U.S.C. § 1415(i)(2)(A); Gardner v. Sch. Bd. Caddo Parish, 958 F.2d 108, 111 (5th Cir. 1992).

B.   Non-IDEA Claims

Because the court has not permitted discovery in this case, the court considers the viability of Plaintiffs' non-IDEA causes of action according to the Federal Rule of Civil Procedure 12 standard for determining whether Plaintiffs stated claims upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts, but need "not strain to find inferences favorable to the plaintiff[]." Cornish v. Corr. Servs. Corp., 402 F.3d 545, 548-49 (5th Cir. 2005)(quoting Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353,

31

361 (5th Cir. 2004)).  Dismissal of a claim is improper unless there is no doubt that the plaintiff will be unable to prove the necessary facts in support of the allegations to entitle the plaintiff to relief.  Cornish, 402 F.3d at 549.

### III.  IDEA Claim

The main thrust of the IDEA is to ensure that states provide disabled children with "free appropriate public education."  See 20 U.S.C. §§ 1400(d)(1)(A), 1412(a), 1415(a); Morris v. Dearborne, 181 F.3d 657, 674 (5th Cir. 1999); Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1044 (5th Cir. 1989).  The IDEA contains both procedural and substantive requirements.  See, e.g., 20 U.S.C. §§ 1412(a), 1414, 1415.  Therefore, the focus of the court's review is twofold:

> First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 (1982); see also, Adam J. ex rel. Robert J., 328 F.3d 809; Bobby R., 200 F.3d at 346.

The IDEA procedures guarantee parents the right to examine all school records, the right to participate in the development of IEPs for their children, and the right to an impartial due process hearing at which they can air their complaints about the school district's "identification, evaluation, or educational placement of

32

the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6); see also 20 U.S.C. §§ 1415(b)(1)-(5), 1415(f).   In certain situations, a procedural violation alone may "warrant a finding that, as a matter of law, the school has failed to provide a free appropriate public education." Adam J. ex rel. Robert J., 328 F.3d 809, 811 (quoting Buser by Buser v. Corpus Christi Indep. Sch., 51 F.3d 490, 493 (5th Cir. 1995)).   However, the procedural violation must result in the loss of an educational opportunity in order to be actionable.   Id. at 812.

In deciding the second question, the Fifth Circuit directs courts to consider: 1) whether "the program is individualized on the basis of the student's assessment and performance;" 2) whether the program is implemented in the least restrictive environment; 3) whether the services are coordinated and collaborative; and 4) whether "positive academic and non-academic benefits are demonstrated." Michael F., 118 F.3d at 253.   School officials must develop an IEP for each student and must determine the appropriate placement for the student. Daniel R.R., 874 F.2d at 1039.

The placement is appropriate if it is designed to meet the particular child's needs and includes services that will permit the child to benefit from instruction, even if it is not the "best possible" placement. Adam J. ex rel. Robert J., 328 F.3d at 808. The party attacking the appropriateness of an IEP or a placement

33

recommended by the school bears the burden of demonstrating why it is inappropriate.  <u>Adam J. ex rel Robert J.</u>, 328 F.3d at 808; <u>Michael F.</u>, 118 F.3d at 252.

Even a cursory review of the administrative record reveals two ugly truths:  1) those involved in planning Ariel's educational program seem to be unable to agree on the best educational program *for Ariel*; and 2) Ariel has suffered for it.  In Ariel's case, her own mother often has caused delays in Ariel's evaluation or placement and has changed positions, apparently out of spite or distrust, to Ariel's detriment.  Despite the court's concern about the ineffectiveness of the process in meeting Ariel's needs, this court has no place directing the ARD Committee on the best course of action and no power to force the parties to improve relations. In fact, patient efforts toward conciliation carried out by the presiding judge in the previous lawsuit did not succeed. Therefore, the court here must stick to its limited role, which is to review Ariel's educational placement and services to determine whether Defendant violated the IDEA.

Plaintiffs allege Defendant violated the IDEA procedurally and substantively.  Specifically, Plaintiffs contend that Defendant failed to develop appropriate IEPs for Ariel, failed to schedule ARD meetings in a timely fashion, excluded Deborah from meetings, ignored all of her recommendations, and failed to reimburse her for privately-obtained related services.  Defendant counters that

34

"[t]he problem in this case is not the educational program offered by the District, but [Ariel]'s refusal to access the program and the inconsistent demands her mother makes on the District."[197] Defendant contends that it regularly held ARD meetings and involved Deborah in the development of Ariel's IEPs.   Finally, Defendant argues that Plaintiffs are not entitled to any further reimbursement for the services they obtained privately.

Before addressing each of Plaintiffs' complaints, the court must address Plaintiffs' request that the court consider as additional evidence testimony about the events that occurred subsequent to the due process hearing decision on February 10, 2005.  Defendant points out that the right to present additional evidence is extremely limited.  In this case, Plaintiffs have filed another due process hearing request since filing the one that is the subject of this suit.  In that due process hearing, Plaintiffs may present all of their complaints of procedural and substantive IDEA violations that occurred after February 10, 2005.  This court is not willing to reach down and pull those complaints into the district court; they remain part of her more recent challenge. Even if the court were inclined to consider subsequent complaints, it lacks subject matter jurisdiction because the administrative remedies have not been exhausted.  <u>See</u> <u>Gardner</u>, 958 F.2d at 111. Plaintiffs present no additional evidence related to the time

---

[197]     Defendant's Motion for Summary Judgment, Docket Entry No. 24, p. 15.

period covered by the February 2005 due process decision.

**A.  IEPs**

Defendant prepared IEPs for Ariel on six separate occasions between January 2, 2003, and February 10, 2005.  The only IEP from this time period with which Deborah completely agreed was the one created on January 9, 2003.  On other occasions, Deborah agreed with various aspects of the proposals developed in the ARD Committee meetings, but refused to sign off on any IEP as a whole. Because the committee reached no subsequent agreement, the "stay put" placement was developed in January 2003, when Ariel attended seventh grade at First Colony Middle School.  See 20 U.S.C. § 1415(j) (stating that, during the pendency of any legal proceedings under the IDEA, the student is to remain in the current educational placement unless the school and parents can agree to another plan). In its review of Ariel's educational program, the court considered whether both the last agreed-upon IEP and the later IEPs proposed by Defendant (with which Deborah disagreed) were reasonably calculated to enable Ariel to receive educational benefits.

Defendant individualized the IEPs for Ariel, taking into special consideration her sleep disorder, attention deficit disorder, and depression.  Because the sleep disorder caused Ariel to rise late in the day, Defendant adjusted her school schedule, but continued to mainstream Ariel in regular education classes.  In 2003, Deborah sought homebound services from 3:00 p.m. to 5:00 p.m.

36

four days a week.  Although a majority of the ARD Committee denied
that request because Ariel was not confined to the home, Defendant
adjusted her schedule and added tutoring after school.  At one
point, Defendant suggested night high school to allow Ariel more
instruction during her maximum performance hours.  Deborah rejected
the suggestion.

Defendant allowed Ariel to leave class anytime to visit the
nurse or to go to the resource center.  Defendant encouraged Ariel
to bond with instructors by pairing her with certain teachers and
providing one-on-one tutoring.  Defendant offered Ariel on-campus
counseling and, during the summer when school counselors were not
available, paid for sessions with a private therapist.  The IEPs
included goals related to improving Ariel's attendance and
increasing her success in completing assignments.  Defendant
allowed Ariel generous extensions of time to complete missed work.
The school-term IEPs also included behavior intervention plans with
rewards for successes in attendance and schoolwork.  Defendant
tailored the IEPs as needed for regular school terms, summer
programming, and residential placement.  On the meeting dates when
the committee did not develop new IEPs, the committee members
suggested modifications to the current IEP to address lack of
progress or new issues.

When Deborah requested residential placement, the ARD
Committee sought an independent psychological evaluation to

37

determine the appropriateness.  Deborah interfered with the
completion of the evaluation and thereby delayed the committee's
decision on residential placement.  After reviewing the evaluation,
the committee unanimously approved placement at Bayes, one of the
facilities suggested by Deborah.  After visiting Bayes, Deborah
changed her mind and did not follow through with the committee's
plan.  The other committee members agreed to her suggestion that
Ariel go to THCS instead, but Deborah refused to complete the
necessary paperwork.  She took exception to the failure of the
committee to set a definite length of stay, even though all of
those who worked with Ariel agreed that the length of placement
necessarily depended on Ariel's progress.  In the summer of 2004,
Deborah decided that she no longer favored residential treatment.
Dr. Ansell, on the other hand, continued to support residential
placement through the time of the due process hearing.

Before Deborah decided against residential treatment, she
consistently advocated for a more restrictive placement.  Defendant
attempted placement in the regular classroom setting, a minimally
restrictive environment, as long as it was possible to meet her
needs.  Upon the suggestion of residential placement, the committee
sought the opinion of an independent professional before agreeing
to such a drastic departure from mainstreaming.

In developing Ariel's IEPs, Deborah and her representatives,
as well as numerous teachers, tutors, and counselors from within

the school setting and from outside sources all gave input.  The IEPs themselves called for the participation and coordination of several providers.    The teachers communicated Ariel's missed assignments to the school tutor, to HLC, and to Deborah, and the school gave Ariel extra sets of books for home and HLC.  Defendant provided Ariel with a monitoring teacher to assist with the coordination of services and schoolwork.

Across the board, Ariel did well scholastically, was well-behaved, and developed good peer relationships when she was present in class or at tutoring sessions.  However, the hours that Ariel attended school varied: some days, she was present at the start of the day; some days, she came in after noon; many days (most for several school years), she did not attend at all.   Not surprisingly, the high number of all-day absences greatly interfered with her success.  The lack of instruction and the accumulation of makeup work apparently overwhelmed both Plaintiffs. When Ariel attended school, the program designed by the ARD Committee met Ariel's needs and allowed her the opportunity for positive educational benefits.  The court agrees with the hearing officer that Defendant developed and implemented appropriate IEPs for Ariel.

**B.   ARD Meetings**

By the court's count, Defendant held ten ARD Committee meetings between January 2, 2003, and February 10, 2005.  Two of

those meetings were continued onto a second day and time.  The record suggests that Defendant held an ARD Committee meeting each time Deborah formally requested one, that Defendant provided notice to Deborah, and that many of the meetings convened for more than two hours.  Although Ariel attended none of the meetings, Deborah attended every one with the exception of the August 25, 2004, meeting, when she refused to participate in a meeting held on Defendant's property.[198]  On each of several occasions, Deborah was represented by a parent's advocate.  She contributed her views at all of the meetings and wrote addenda to the minutes of the meetings to correct information or to express her disagreement with the proposals of the other members.  Deborah often presented additional materials that were attached to the minutes.  With the exception of the January 2003 meeting, Deborah disagreed with aspects of the majority's proposed placement at every meeting.

The record in this case demonstrates that the committee met and reviewed Ariel's educational program more often than required by law.  See 20 U.S.C. § 1414(d)(4)(A)(i)(requiring the IEP team to review the child's IEP at least annually).  Defendant complied with statutory and case law by allowing Deborah to examine Ariel's

---

[198]   Deborah missed this meeting in apparent protest against the restricted access imposed on her by Defendant after she made a comment that Defendant perceived to be a bomb threat.  Deborah refused to attend the meeting, despite Defendant's explicit permission for her to attend.

40

records and to participate in the meetings.[199]   <u>See</u> 20 U.S.C. §
1415(b)(1)(giving parents the right to participate in IEP
meetings).   Nothing guarantees the parent "the right to dictate an
outcome," but only the opportunity to participate in the process.
<u>White ex rel. White v. Ascension Parish Sch. Bd.</u>, 343 F.3d 373, 380
(5th Cir. 2003).   In sum, the court agrees with the hearing officer
that Defendant complied with applicable state and federal laws in
setting and conducting the ARD Committee meetings.

**C.   <u>Reimbursement</u>**

    According to the record, the ARD Committee approved a set
number of therapy sessions with Dr. Ansell and supplemental
tutoring services at a private tutoring center in addition to the
educational and counseling services offered on campus.   The hearing
officer ordered Defendant to reimburse Deborah for transportation
expenses related to the approved tutoring services.   The total
awarded, $259.00, corresponds to the cost of transportation to and
from seventy-four visits to the tutoring center.

    In their complaint, Plaintiffs requested reimbursement for
"transportation expenses, psychological counseling expenses,

---

[199]    Plaintiffs also complain that Defendant's legal counsel controlled
the ARD Committee meetings.  Although the record shows that the attorney attended
the majority of the meetings during the relevant time period, nothing in the
minutes even remotely suggests that he directed the actions or decisions of the
committee members.  On occasion, Deborah complains in her addendum to a meeting's
minutes that the attorney prevented her from presenting evidence or otherwise
interfered with the meeting.

attorney's fees and costs of litigation."[200]   Defendant only is required to provide related services, such as transportation and psychological services, "as are required to assist a child with a disability to benefit from special education."   34 C.F.R. § 300.24(a); see also 20 U.S.C. § 1400(d)(1)(A)(stating that one purpose of the IDEA is to ensure children with disabilities a free appropriate public education that includes special education and related services that will meet their unique needs); 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(defining IEP to include "a statement of the special education and related services and supplementary aids and services to be provided to the child").

The ARD Committee approved eight sessions with Dr. Ansell during the summer of 2003 when school counselors were not available, but Ariel failed to make all of her appointments with him.  During the regular school sessions, the committee authorized counseling sessions at school.  Plaintiffs allege that the school sessions were not offered at times that "coincide[d] with Ariel's internal schedule."[201]  Other than this conclusory statement, the court finds nothing in the record, and Plaintiffs point to nothing, that indicates the school counselors were unwilling to see Ariel during the hours that she was expected to attend school.  In fact, the evidence shows that Ariel's all-day absences during the spring

---

[200]    Plaintiffs' Original Complaint, Docket Entry No. 1, p. 20.

[201]    Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, p. 17.

semester of 2003, the entire 2003-2004 school year, and the fall of 2004 prevented her attendance at the counseling sessions regardless of the time that they were scheduled.

With regard to the additional transportation expenses, attorney's fees, and litigation costs that Plaintiffs seek, they provide no detail whatsoever concerning their entitlement to additional reimbursement.  In their complaint, Plaintiffs simply state that the hearing officer erred in not granting reimbursement for "certain dates of transportation for tutoring services . . . that were omitted from his award."[202]   In their response to Defendant's motion for summary judgment, they argue that they incurred transportation expenses "for the purposes of achieving the educational goals of Ariel."[203]   The other requested sums are explained nowhere.   Absent factual and legal support for reimbursement, the court is not at liberty to overturn the hearing officer's decision.

Because the court finds that Defendant provided Ariel with a free appropriate public education, substantively and procedurally, the court must dismiss Plaintiffs' IDEA claim.

### IV.  Non-IDEA Claims

As a preliminary matter, several issues raised by Plaintiffs

---

[202]    Plaintiffs' Original Complaint, Docket Entry No. 1, p. 13.

[203]    Plaintiffs' First Amended Response to Defendant's Motion for Summary Judgment, Docket Entry No. 45, p. 17.

are barred by res judicata.[204]  Res judicata, or claim preclusion, bars the litigation of claims that have been or should have been raised in an earlier suit.  <u>Test Masters Educ. Servs., Inc. v. Singh</u>, 428 F.3d 559, 571 (5th Cir. 2005), <u>cert. denied</u>, ___ U.S. ___, 2006 WL 393187 (April 3, 2006).  A claim is precluded if: 1) the parties are identical; 2) a court of competent jurisdiction rendered the judgment in the prior suit; 3) the prior court issued final judgment on the merits; and 4) the same claim or cause of action was involved in both actions.  <u>Id.</u>  The preclusion extends to all of the plaintiff's rights with respect to the set of facts that undergird the original action.  <u>Id.</u>

In their previous lawsuit against Defendant, Plaintiffs raised claims of discrimination and retaliation in violation of the ADA, the RA, and the First Amendment.  Their complaint in that lawsuit details two incidents that Plaintiffs raise again here in support of their instant ADA and Title IX claims: 1) the May 2003 incident in which a male student pulled down Ariel's shirt; and 2) the July 2003 intra-district transfer request.[205]  Although the district

---

[204]   Defendant argues that claims based on these incidences are barred by collateral estoppel, which "precludes a party from litigating an issue already raised in an earlier action between the same parties only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action." <u>Test Masters Educ. Servs., Inc. v. Singh</u>, 428 F.3d 559, 572 (5th Cir. 2005), <u>cert. denied</u>, ___ U.S. ___, 2006 WL 393187 (April 3, 2006).  However, the broader doctrine of res judicata applies in this case.

[205]   <u>See</u> Defendant's Motion for Summary Judgment, Docket Entry No. 24, Ex. B, Plaintiffs' Second Amended Complaint in Civil Action No. H-03-1001, pp. 59-62, 68.

court in the prior action did not specifically address those incidents,[206] it did conclude that "Plaintiffs have not met their burden as to any of their IDEA, ADA, Rehabilitation Act, or constitutional claims."[207] Plaintiffs appealed the district court's decision, but the appeal was dismissed for want of prosecution.[208]

Plaintiffs clearly raised both the alleged sexual harassment by a co-student and the alleged retaliatory denial of an intra-district transfer in the prior lawsuit. Plaintiffs and Defendant were parties to the lawsuit. The prior court issued final judgment on the merits of Plaintiffs' claims. Although they did not bring a Title IX cause of action, the facts alleged in support of that action here are part of the same transaction underlying their claims in the prior suit. They simply missed their opportunity to try the Title IX claims based on those same facts. Accordingly, to the extent Plaintiffs' non-IDEA claims are based on the two transactions raised in the prior suit, they must be dismissed.

With regard to Plaintiffs' non-IDEA claims that have not been

---

[206] Plaintiffs argue that the court did not dispose of the sexual harassment claim because it occurred outside of the time period covered by the prior lawsuit. The time period to which they refer applied only to the IDEA action. See Defendant's Motion for Summary Judgment, Docket Entry No. 24, Ex. A, Memorandum and Order in Civil Action No. H-03-1001, p. 10. The court did not exempt any of Plaintiffs' claims or incidents in its analysis of the non-IDEA claims. See id. at pp. 18-24. Regardless, Plaintiffs raised the issues in their complaint and had the opportunity to pursue their claims to the full extent of the law.

[207] Id. at p. 24.

[208] Order of the Clerk's Office dated Jan. 13, 2006, Docket Entry No. 154, Civil Action No. H-03-1001.

presented to a court, Plaintiffs may assert such claims under laws other than the IDEA, but only to the extent that they are factually and legally distinct from the IDEA claims.   20 U.S.C. § 1415(l); Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 297 (5th Cir.), cert. denied, ___ U.S. ___, 126 S. Ct. 416 (2005)(referring to the bar as issue preclusion).   Therefore, to the extent that Plaintiffs' other legal claims are based on the same actions and inactions by Defendant that support their IDEA claim (i.e., that Defendant denied Ariel educational services or accommodations because of her disabilities) they should be dismissed.   On the other hand, to the extent that the other claims raise issues unrelated to their claims that Defendant denied Ariel a free appropriate public education, they are not precluded and must be examined.

## A.   ADA and RA Discrimination and Retaliation Claims

The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   The RA directs the identical prohibition at programs that receive federal financial assistance and incorporates the ADA standards for determining whether a violation of the RA has occurred.   29 U.S.C. §§ 794(a); 794(d).   A claim for discrimination based on disability requires proof that: 1) the plaintiff is a

46

qualified individual; 2) the defendant excluded the plaintiff from participation in, denied the plaintiff benefits of service, programs, or activities, or otherwise discriminated against the plaintiff; and 3) the exclusion, denial of benefits, or discrimination was based on the plaintiff's disability.  See Lightbourn v. County of El Paso, Tex., 118 F.3d 421, 428 (5th Cir. 1997)(stating elements of an ADA discrimination claim in a case challenging a state voting system).

The ADA also protects individuals from retaliation for opposing any act that is illegal under the ADA or for participating in any investigation, proceeding or hearing under the ADA.  42 U.S.C. § 12203.  The regulations implementing the RA contain a similar provision prohibiting "retaliation for opposing any practice made unlawful by . . . [inter alia] the Rehabilitation Act . . . or for participating in any stage of administrative or judicial proceedings under those statutes."  20 C.F.R. § 1614.101(b); see also Shannon v. Henderson, 275 F.3d 42, No. 01-10346, 2001 WL 1223633, at *3 and n.4 (5th Cir. Sept. 25, 2001)(unpublished).  The elements of a retaliation prima facie case are: 1) a protected activity; 2) an adverse action; and 3) a causal connection between the two.  Cf. Weixel v. Bd. of Educ. of the City of New York, 287 F.3d 138, 148 (2[d] Cir. 2002)(including as an additional element the requirement that the alleged retaliator have knowledge of the protected activity and applying the elements to a

claim of retaliation in an educational setting).

The Fifth Circuit has not defined the term "adverse action" in the context of disability retaliation in a school setting. However, actionable decisions in the employment setting only include "hiring, granting leave, discharging, promoting, and compensating" and those decisions that constitute "a significant change in employment status" or that cause a "significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998)(defining "tangible employment action" in the context of a sexual harassment case); Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000)(quoting Dollis v. Rubin, 77 F.3d 777, 782 (5th Cir. 1995), and defining "adverse employment action" in the context of a retaliation claim). Personnel decisions are not considered adverse if compensation, benefits, and level of responsibility remain the same. Pegram v. Honeywell, Inc., 361 F.3d 272, 282 (5th Cir. 2004).

Plaintiffs' allegations of discrimination under the ADA and RA center on Defendant's alleged refusal to provide educational services, programs, and activities as accommodations for Ariel's disabilities. The discrimination claim, then, is redundant of the IDEA claim and must be dismissed.

As for Plaintiffs' retaliation claim, Plaintiffs' complaint alleges that Defendant, in retaliation for Plaintiffs' seeking special education services and speaking out against the alleged

violations of the law: 1) falsely characterized a remark by Deborah as a terroristic threat and responded by reporting the comment to the police and limiting her access to Defendant's property; 2) initially denied and ultimately delayed Plaintiffs' request for an intra-district transfer; 3) used Ariel's guardian ad litem as a tool to harass Plaintiffs; and 4) allowed other students to harass Ariel.  In their response to Defendant's summary judgment motion, Plaintiffs add that Defendant's decision not to promote Ariel to eighth grade and Defendant's refusal to give Ariel certain credits were additional acts of retaliation.

The first action listed above, concerning the threat made by Deborah, is not actionable.  Deborah suffered no change in benefits as a result of Defendant's report to the police.  She was not arrested or charged with a crime.  Defendant's decision to limit Deborah's access to its property posed only a minimal inconvenience, not a significant change in benefits.  Plaintiffs' complaint contains no allegation that Defendant ever actually denied Deborah access to its property upon receiving her prior notification.

The allegation that Defendant denied the intra-district transfer request in retaliation for Plaintiffs' protected activity is barred by res judicata, as explained above.  Even if this claim were allowed, the court finds that it also does not rise to the level of an adverse action.  Although Defendant initially denied

49

the request, its Board of Trustees eventually granted the request on appeal. The delay did not deprive either Plaintiff of significant benefits.

Plaintiffs' third allegation of retaliation is couched in terms suggesting action by Defendant, but actually addresses the actions of a nonparty. The specific actions of the guardian ad litem about which Plaintiffs complain are her "numerous and constant threats" that she intended to report Deborah to Children's Protective Services.[209] As such, the conduct does not involve any action that caused a significant change in Plaintiffs' status. Therefore, even if Plaintiffs could prove that the guardian ad litem acted at Defendant's direction, they could not maintain a claim of retaliation based on her actions.

The fourth claim is similar to the third in that Plaintiffs claim that Defendant retaliated against them in the person of another. According to Plaintiffs' allegations, Ariel was engaged in three altercations[210] with other students in the time period May 2003 to November 2005. Plaintiffs contend that Defendant's reactions to those three incidents created an atmosphere that condoned harassment of Ariel. Three incidents, with more than a year in between any two, to which Defendant responded with

---

[209]   Plaintiffs' Original Complaint, Docket Entry No. 1, p. 8.

[210]   One of the incidents relied upon by Plaintiffs is the alleged sexual harassment in May 2003. This claim is precluded by res judicata as explained above. For purposes of this discussion, the court considers the incident, despite its preclusion, in connection with the other two physical altercations.

50

investigations and disciplinary actions do not lend themselves to an inference that Defendant was the author of the conduct. Plaintiffs' theory of retaliation in this regard is far too tenuous to state a claim.

Finally, the last two of the above allegations of retaliation concern Ariel's educational benefits and services and are, therefore, precluded by the dismissal of Plaintiffs' IDEA claim. Plaintiffs' claims of retaliation must be dismissed because they failed to allege, as a matter of law, any adverse action.

**B.   Title IX Harassment Claim**

Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). Under certain circumstances, student-on-student sexual harassment that is sufficiently severe, pervasive, and objectively offensive as to deprive the victim of access to the school's educational benefits and services may qualify as actionable discrimination. Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 650 (1999).

A school administration can be held liable for a student's actions only if it exhibits deliberate indifference to sexual harassment of which it has actual knowledge. Id. A defendant's

51

response to sexual harassment is considered deliberately indifferent only if it is "clearly unreasonable in light of the known circumstances." Id. at 648. Title IX does not instill in the plaintiff the right to dictate the appropriate punishment meted out by the school administration. Id. ("In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by the school administrators.")

In the context of employment discrimination, courts have set a high standard for what constitutes sufficiently severe and pervasive sexual harassment. The Fifth Circuit has acknowledged that all of the sexual hostile work environment cases decided by the Supreme Court have involved patterns of long lasting, unredressed sexual conduct that clearly affected the plaintiffs' work environments. Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir. 1999).

Plaintiffs claim that Defendant was deliberately indifferent to the sexual harassment experienced by Ariel and should have known that she was being harassed because Plaintiffs brought it to Defendant's attention many years before the May 2003 incident, back when Ariel was in second grade. The only incident on the record in this case that could be construed as sexual harassment occurred in May 2003 when a male student allegedly pulled down Ariel's shirt for a photograph. Initially, the associate principal reprimanded both students. Later, presumably at Deborah's insistence, the

principal investigated the incident, but was unable to corroborate Ariel's account.    Nevertheless, Defendant notified the boy's parents and warned the boy that such conduct would not be tolerated.

For the reasons stated above, Plaintiffs' Title IX claim based on the May 2003 incident is barred by res judicata.    Even if the allegations were actionable in this case, they fail to suggest that Defendant had any knowledge, much less actual knowledge, of sexual harassment in advance of that incident.    Although Defendant's response did not satisfy Deborah, it cannot be characterized as deliberately indifferent.    Moreover, although inappropriate and offensive, the boy's alleged conduct on that one occasion does not rise to the level of severe and pervasive sexual harassment that would trigger Title IX protections.

The Title IX claim must be dismissed.

## C.   **First Amendment Retaliation**

A plaintiff can establish a prima facie case under 42 U.S.C. § 1983[211] ("Section 1983") by alleging 1) a violation of a federal constitutional or statutory right; and 2) that the violation was committed by an individual acting under the color of state law.

---

[211]    Section 1983 provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

<u>Doe v. Rains County Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995).  In order to attribute Section 1983 liability to a local government, a plaintiff must establish the elements of a prima facie case and must demonstrate that the city had a custom or policy that resulted in the constitutional injuries alleged.  <u>See Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978); <u>Eugene v. Alief Indep. Sch. Dist.</u>, 65 F.3d 1299, 1304 (5th Cir. 1995).

Plaintiffs allege that Defendant retaliated against Deborah in violation of the First Amendment[212] by reporting her remark as a terroristic threat and by limiting her access to Defendant's property.  Even if these allegations supported a finding of constitutional harm, Plaintiffs cannot state a claim under Section 1983 against Defendant, a governmental subdivision, absent an allegation that Defendant had a policy or custom that caused Plaintiffs' constitutional injury.  Plaintiffs fail to allege any policy or custom of inhibiting free speech.  Plaintiffs' First Amendment claim must be dismissed.

### IV.  Conclusion

Based on the foregoing, the court **GRANTS** Defendant's Motion for Summary Judgment.

---

[212]   The First Amendment prohibits the Congress from enacting any law that abridges the freedom of speech and protects an individual from retaliatory governmental action for exercising her right to free speech.  U.S. Const. amend. 1; <u>Keenan v. Tejeda</u>, 290 F.3d 252, 258 (5th Cir. 2002).

**SIGNED** in Houston, Texas, this 20th day of April, 2006.

Nancy K. Johnson
United States Magistrate Judge